UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

UNITED STATES *ex rel.* ELKAY
MANUFACTURING COMPANY,

        Plaintiff,

v.

COMPASS MANUFACTURING
INTERNATIONAL, LLC;  DELEON
COMPANIES, INC.; ARMANDO
DELEON III; PORCELAMEX LLC;
MICHAEL WOLFE; AND DECHANG LI,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED UNDER SEAL**

3:15 C V-155-S

**COMPLAINT**
For damages and other relief
Under the False Claims Act,
31 U.S.C. § 3729, *et seq.*

DEMAND FOR JURY TRIAL

**FILED**
VANESSA L. ARMSTRONG, CLERK

FEB 19 2015

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

## COMPLAINT

1.     Plaintiff, United States *ex rel.* Elkay Manufacturing Company, brings this action under the False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA" or the "Act") to recover damages and civil penalties arising from the Defendants' entry, or conspiracy to enter, drawn stainless steel sinks ("drawn sinks") produced in the People's Republic of China ("China") without the payment of antidumping or countervailing duty cash deposits as required by the U.S. Department of Commerce ("Commerce") pursuant to *Drawn Stainless Steel Sinks From the People's Republic of China*, 78 Fed. Reg. 21,592 (April 11, 2013) (antidumping duty order); *Drawn Stainless Steel Sinks From the People's Republic of China*, 78 Fed. Reg. 21,596 (April 11, 2013) (countervailing duty order) (the "AD/CVD Orders"). The drawn sinks that are the subject of this action were transshipped through Mexico to avoid the payment of antidumping and countervailing duty cash deposits between 51.87 and 51.98 percent and general Customs duties of 3.4 percent applicable to drawn sinks from China. Defendants falsely declared, caused to be

24435034

falsely declared, or conspired to falsely declare, to U.S. Customs and Border Protection ("CBP")

that the drawn sinks were made in countries other than China and were not subject to

antidumping or countervailing duty cash deposits. These false claims enabled the Defendants to

avoid paying antidumping and countervailing duty cash deposits and general Customs duties. By

importing or conspiring to import drawn sinks manufactured in China and declaring them to be

made in Mexico, Defendants also knowingly made, caused to be made, or conspired to make a

false statement material to their obligation to pay 10 percent marking duties and knowingly

concealed or avoided their obligation to pay 10 percent marking duties.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action under 28 U.S.C. § 1331, which confers

jurisdiction on this Court for actions brought under the FCA, and personal jurisdiction over each

of the Defendants.

3.      Venue over Defendants is proper in this district pursuant to 31 U.S.C. § 3732(a),

because one of the Defendants, Compass Manufacturing International ("CMI"), can be found,

resides, and transacts business in the Western District of Kentucky where at least one of the acts

proscribed by 31 U.S.C. § 3729 has occurred.

## PARTIES

4.      Elkay Manufacturing Company ("Elkay" or the "Relator") is the Plaintiff in this

action for itself and for the United States, 31 U.S.C. § 3730(b)(1). Elkay is a Delaware

corporation and a resident of Illinois with its principal place of business at 2222 Camden Court,

Oak Brook, IL 60523. Elkay is a U.S. manufacturer of drawn sinks and filed the petitions that

led to the AD/CVD Orders on drawn sinks from China.

5.      Elkay voluntarily provided information on which this action is based to the

Government prior to filing this Complaint. Elkay served its written disclosure of substantially all material evidence and information regarding this action on the Government together with this Complaint in accordance with 31 U.S.C. § 3730(b)(2).

6. Defendant CMI is a Kentucky limited liability company with its principal place of business at 6702 Enterprise Drive, Louisville, KY, 40214. CMI is a wholly owned subsidiary of 5G Global Partners, Inc. CMI imported or conspired to import drawn sinks that have been manufactured in China by Zhongshan Superte Kitchenware Co., Ltd. ("Superte") and that are subject to the AD/CVD Orders on drawn sinks from China without the payment of antidumping or countervailing duty cash deposits required by the AD/CVD Orders, without the payment of general Customs duties, and without the payment of marking duties.

7. Defendant Michael Wolfe is an individual and resident of the state of Kentucky who works at 6702 Enterprise Drive, Louisville, KY 40214. Mr. Wolfe is the President of CMI and owns five percent of 5G Global Partners Inc. Mr. Wolfe directs the daily operations of CMI and negotiated with Defendant Mr. DeLeon for the sale of CMI. The sale of CMI, however, did not take place.

8. Defendant De-Chang ("Danny") Li is an individual and resident of the State of New York with an address of 5808 58th Avenue, Maspeth, NY 11378. Mr Li is a director, the chief executive officer, and the largest shareholder in 5G Global Partners, Inc., which owns Defendant CMI and controls its operations. Mr. Li also is the product development manager of CMI and is the primary CMI official in contact with Superte, CMI's supplier of drawn sinks.

9. Defendant DeLeon Companies, Inc. ("DeLeon Companies") is a corporation organized under the laws of Texas and is located at 5847 San Felipe, Suite 1700, Houston, TX 77057. Defendant DeLeon Companies imported or conspired to import drawn sinks that were

manufactured by Superte in China without the payment of antidumping or countervailing duty cash deposits required by the AD/CVD Orders, without the payment of general Customs duties, and without the payment of marking duties.

10.     Defendant Porcelamex LLC is a Texas Limited Liability Company with its principal place of business at 2525 North Loop West, Suite 125, Houston, TX 77008. Porcelamex LLC has been identified by Defendant Armando DeLeon III as "doing business as" Defendant DeLeon Companies, Inc.  DeLeon Companies' filing with the Texas Secretary of State provides that its legal name is DeLeon Companies, Inc., but also uses the "Assumed Name" of Porcelamex.  **Exhibit 1.**

11.     Defendant Armando DeLeon III ("Mr. DeLeon") is an individual and resident of the state of Texas.  Mr. DeLeon is the owner, president, and chief executive officer of Defendant DeLeon Companies and is the chairman, president, and chief executive officer of Defendant Porcelamex LLC.  Mr. DeLeon conspired to import drawn sinks manufactured by Superte in China through Mexico into the United States without the payment of antidumping or countervailing cash deposits required by the AD/CVD Orders, without the payment of general Customs duties, and without the payment of marking duties.

## FACTS

### The AD/CVD Orders

12.     Antidumping and countervailing duty investigations are initiated by Commerce and U.S. International Trade Commission ("ITC") based on petitions brought by U.S. manufacturers that are being injured by unfair trade practices perpetrated by foreign exporters and producers or foreign governments.  19 U.S.C. §§ 1671a, 1673a.  In an antidumping petition, the U.S. manufacturer alleges that the foreign exporters or producers of merchandise subject to

the petition are engaging in discriminatory pricing, that is, selling their merchandise in the United States at "less than fair value." 19 U.S.C. § 1673. In a countervailing duty petition, the U.S. manufacturer alleges that the government of a foreign country is providing countervailable subsidies to the foreign exporters and producers of the merchandise that is the subject of the petition. 19 U.S.C. § 1671.

13.     Following the initiation of an antidumping or countervailing duty investigation, Commerce issues a preliminary determination on the existence of the alleged unfair trade practice, and the ITC issues a preliminary determination on the existence of injury to the domestic industry. 19 U.S.C. §§ 1671b, 1673b. If Commerce finds that an unfair trade practice has occurred and the ITC finds that that the domestic industry suffered material injury (or threat of material injury) by reason of imports of the subject merchandise, Commerce will direct CBP to impose antidumping and countervailing cash deposits on the subject imports at the time of its preliminary antidumping or countervailing duty determination. 19 U.S.C. §§ 1671b(d)(1)(B), 1673b(d)(1)(B). The required cash deposits are calculated by Commerce based on the exporter's actual data. 19 U.S.C. §§ 1671b(d), 1673b(d). Accordingly, the amount of antidumping and countervailing duty cash deposits typically are specific to an exporter and/or producer.

14.     Upon completion of an antidumping or countervailing duty investigation, Commerce will issue a final determination on the existence of an unfair trade practice, and the ITC will issue a final determination on the existence of injury. 19 U.S.C. §§ 1671d(b), 1673d(b). If both final determinations are affirmative, Commerce publishes antidumping or countervailing duty orders, or both, and continues to direct CBP to impose cash deposits on imports of subject merchandise. 19 U.S.C. §§ 1671d(c), 1673d(c). The antidumping and countervailing duty orders describe in detail the merchandise that is subject the cash deposit requirement. The

assessment of antidumping and countervailing duties takes place at a later time, typically at the conclusion of the first administrative review of the antidumping or countervailing duty order. 19 C.F.R. § 351.212. The Tariff Act of 1930, as amended, provides the rules governing such investigations in the United States, which are in accordance with the United States' obligations under the World Trade Organization Agreements.

15.     In March 2012, Elkay filed antidumping and countervailing duty petitions alleging that Chinese producers of drawn sinks were selling subject merchandise in the United States for less than fair value and benefitting from countervailable subsidies, injuring the domestic industry.

16.     On August 6, 2012, Commerce issued a preliminary determination that Chinese producers benefitted from countervailable subsidies and instructed CBP to collect countervailing duty cash deposits ranging from 2.12 to 13.94 percent. On October 4, 2012, Commerce issued a preliminary determination that Chinese producers were dumping drawn sinks in the United States and instructed CBP to collect antidumping duty cash deposits ranging from 54.25 to 76.53 percent.

17.     On February 26, 2013, Commerce published its final antidumping and countervailing duty determinations. Commerce calculated dumping margins for Chinese exporters ranging from 27.14 to 76.53 percent. Commerce calculated subsidy rates for the Chinese exporters ranging from 4.80 percent to 12.26 percent.

18.     On April 4, 2013, the ITC determined that that the domestic industry producing drawn sinks was materially injured by reason of dumped and subsidized imports from China. Commerce published the AD/CVD Orders on April 11, 2013. *See Drawn Stainless Steel Sinks From the People's Republic of China*, 78 Fed. Reg. 21,592 (April 11, 2013) (antidumping duty

order);  *Drawn Stainless Steel Sinks From the People's Republic of China*, 78 Fed. Reg. 21,596 (April 11, 2013) (countervailing duty order).

19.     Superte is a Chinese producer and exporter of drawn sinks.  Foshan Zhaoshun Trade Co Ltd. ("Zhaoshun") is a Chinese exporter of drawn sinks produced by Superte.  Drawn sinks produced by Superte and exported by Zhaoshun are subject to the AD/CVD Orders and a combined antidumping and countervailing duty cash deposit rate of 51.98 percent.  Drawn sinks produced by Superte and exported by Superte are subject to a combined antidumping and countervailing duty cash deposit rate of 51.87 percent.  These high cash deposit rates provide an incentive for Chinese drawn sink manufacturers and U.S. importers to seek ways to avoid imposition of cash deposits at the time of importation.  Final duties will be assessed at the conclusion of the first administrative review of the AD/CVD Orders.

20.     Once Commerce publishes an antidumping or countervailing duty order, the obligation to pay cash deposits on entries of subject merchandise is fixed.  19 U.S.C. §§ 1671d(c)(1)(B)(ii) and 1673d(c)(1)(B)(ii).  Commerce identifies any exceptions to this rule in its Federal Register notice of the antidumping or countervailing duty order.  Commerce's Federal Register notice announcing the AD/CVD Orders on drawn sinks did not provide any exceptions to the cash deposit requirement for Chinese-manufactured drawn sinks.  As a result, antidumping and countervailing duty cash deposits are required on every drawn sink that was manufactured in China and entered into the United States, regardless of whether it travels through another country on its way to the United States.

21.     The drawn sinks covered by the scope of the AD/CVD Orders and that are the subject of this action are the following:

> The products covered by the scope of this order are drawn stainless
> steel sinks with single or multiple drawn bowls, with or without

drain boards, whether finished or unfinished, regardless of type of finish, gauge, or grade of stainless steel. Mounting clips, fasteners, seals, and sound-deadening pads are also covered by the scope of this order if they are included within the sales price of the drawn stainless steel sinks. For purposes of this scope definition, the term "drawn" refers to a manufacturing process using metal forming technology to produce a smooth basin with seamless, smooth, and rounded corners. Drawn stainless steel sinks are available in various shapes and configurations and may be described in a number of ways including flush mount, top mount, or undermount (to indicate the attachment relative to the countertop). Stainless steel sinks with multiple drawn bowls that are joined through a welding operation to form one unit are covered by the scope of the order. Drawn stainless steel sinks are covered by the scope of the order whether or not they are sold in conjunction with non-subject accessories such as faucets (whether attached or unattached), strainers, strainer sets, rinsing baskets, bottom grids, or other accessories.

Excluded from the scope of the order are stainless steel sinks with fabricated bowls. Fabricated bowls do not have seamless corners, but rather are made by notching and bending the stainless steel, and then welding and finishing the vertical corners to form the bowls. Stainless steel sinks with fabricated bowls may sometimes be referred to as ''zero radius'' or ''near zero radius'' sinks.

The products covered by this order are currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under statistical reporting number 7324.10.0000 and 7324.10.00.10. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope is dispositive.

### Superte Supplies CMI's And DeLeon Companies/Porcelamex's Drawn Sinks

22.     Ship manifest data are compiled from the bills of lading used by seagoing vessels that carry goods to U.S. ports of entry. Among other things, ship manifest data identify the consignee for each shipment of goods. Ship manifest data are available only for water-born shipments entering the United States. No data are published for overland shipments, including overland shipments from Mexico. Accordingly, ship manifest data can identify shipments of drawn sinks from China, but cannot identify shipments of drawn sinks from Mexico.

- 8 -

23.     Ship manifest data reviewed by Elkay show that CMI imported drawn sinks from China that were produced by Superte and exported by Zhaoshun prior to Commerce's August 6, 2012 preliminary countervailing duty determination and October 4, 2012 preliminary antidumping duty determination on drawn sinks from China.  **Exhibit 2.**  CMI also stated to the U.S. International Trade Commission that it imported drawn sinks produced by Superte.  **Exhibit 3**.  Defendants Li and Wolfe were instrumental to these importations.  Defendant Wolfe was the president of CMI and directed its operations.  In addition, "without [Defendant Li], CMI's ability to bring product in from China was an impossibility."  **Exhibit 4.**  Ship manifest data also show that CMI imported no shipments of drawn sinks from China that were produced by Superte and exported by Zhaoshun after September 2012, the month after CBP began collecting countervailing duty cash deposits and the month before CBP began collecting antidumping cash deposits.  **Exhibit 2.**  Despite the purported lack of shipments reported in the ship manifest data after September 2012, CMI continues to import into the United States drawn sinks manufactured by Superte in China.

24.     CMI sells its drawn sinks under the Bala brand name, and Superte is the manufacturer of those sinks.  Before antidumping and countervailing duty cash deposits were required, CMI labeled its Bala brand sinks as "Made in China."

25.     As shown in CMI's brochure for its Bala brand drawn sinks and photographs taken by Elkay, CMI's Bala brand drawn sinks display a Unified Plumbing Code ("UPC") logo.  *See* **Exhibits 5 and 6.**  The UPC is a model code developed by the International Association of Plumbing and Mechanical Officials ("IAPMO") to govern the installation and inspection of plumbing systems.  The UPC establishes minimum requirements and standards for the protection of the public health, safety, and welfare and is designated as an American National Standard.

26.    IAPMO Research and Testing, Inc. is a product certification body that tests and inspects samples taken from the supplier's stock or from the market, or a combination of both, to verify compliance with the requirements of applicable codes and standards.  IAPMO Research and Testing Inc. also conducts periodic surveillance of the supplier's factory and warehouses and assesses the supplier's quality controls.  If a product satisfies these criteria, IAPMO Research and Testing, Inc. will issue a Certificate of Listing, which authorizes a manufacturer or distributor to use the UPC logo.

27.    Three types of IAPMO Certificates of Listing are available:  (1) a company can manufacture the product and designate one or more different manufacturing locations either inside or outside the United States; (2) a company that has a product manufactured for it can be listed as an additional company on the manufacturer's Certificate of Listing; or (3) a company that has product manufactured for it but does not want to reveal the manufacturer can obtain a "masked" Certificate of Listing.  A masked listing is designated by a "K" prefix to the file number on the distributor's IAPMO Certificate of Listing.

28.    Superte has the first type of IAPMO certificate, which authorizes it to include the UPC logo on the drawn sinks it manufacturers.  Superte's IAPMO Certificate of Listing identifies Superte's address as Food Industry Park, Huangpu Town, Zhongshan City, Guangdong 528429, China.  **Exhibit 7.**  Superte's production facility is located at this address.  Superte does not have manufacturing capabilities in any other country, including Mexico, and its IAPMO Certificate of Listing does not identify a manufacturing facility outside of China.

29.    CMI is listed on Superte's IAPMO certificate pursuant to the second type of listing described in paragraph 28 above.  CMI also has its own "K" file Certificate of Listing for

stainless steel plumbing fixtures, which is the third type of listing available from IAPMO.

**Exhibit 8.**

30.    CMI sells Bala brand drawn sinks that bear a UPC logo in retail outlets across the United States.  Although these sinks were labeled as "Made In Mexico," they were manufactured by Superte in China.  As described in paragraph 29 above, CMI's IAPMO Certificate of Listing indicates that it sells drawn sinks manufactured by a company that also has its own IAPMO Certificate of Listing for that product.  Superte has an IAPMO Certificate of Listing for drawn sinks, and the model numbers of drawn sinks listed its Certificate of Listing are the same model numbers as those listed on CMI's "K" file Certificate of Listing.  In addition, CMI is listed as an additional company on Superte's IAPMO Certificate of Listing for drawn sinks.  CMI is not identified as an additional company on any other producer's IAPMO Certificate of Listing, and the only other IAPMO Certificate of Listing under its name covers only ceramic plumbing fixtures.

31.    DeLeon Companies/Porcelamex also is a distributor of drawn sinks and other stainless steel plumbing fixtures and advertises drawn sinks for sale in the United States on its website.  DeLeon Companies/Porcelamex is not a producer of drawn sinks or stainless steel plumbing fixtures.  Instead, its drawn sinks are supplied by Superte.  In particular, DeLeon Companies has a "K" file IAPMO Certificate of Listing for stainless steel plumbing fixtures, which means that its drawn sinks are manufactured by a company that has its own IAPMO Certificate of Listing.  **Exhibit 9.**  Superte has an IAPMO Certificate of Listing for drawn sinks, and every model number of drawn sinks listed on DeLeon Companies' "K" file IAPMO Certificate of Listing also is listed on Superte's IAPMO Certificate of Listing.

32.     DeLeon Companies/Porcelamex has imported at least one model of Chinese-manufactured drawn sinks into the United States labeled as "Made In Mexico." In particular, Elkay officials identified a Tuscany brand drawn sink, model number 6724107, with a UPC logo labeled "Made in Mexico" at Menards, Inc. Menards is listed as an additional company on Superte's Certificate of Listing for drawn sinks, which means that Menards' Tuscany brand sinks are authorized to bear a UPC logo if they are produced by Superte. Menards is a retailer. Elkay understands that Menards does not import the products it distributes in the United States. Model Number 6724107 also appears on the "K" file IAPMO Certificate of Listing for DeLeon Companies and a Vietnamese affiliate of Superte, but does not appear on any other IAPMO Certificate of Listing. Accordingly, DeLeon Companies was the likely importer of the Tuscany brand drawn sink manufactured in China, marked as "Made in Mexico," and sold in the United States by Menards.

33.     CMI's and DeLeon Companies/Porcelamex's drawn sinks are not manufactured in Mexico. There are four Mexican producers of drawn sinks. The IAPMO certificates for three of the four Mexican producers do not identify CMI or DeLeon Companies/Porcelamex. The fourth producer does not have an IAPMO Certificate of Listing. None of the four Mexican producers supplied or sold drawn sinks to CMI or DeLeon Companies/Porcelamex.

34.     Elkay's independent analysis of the IAPMO data and its knowledge of the four Mexican producers of drawn sinks constitutes knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions under 31 U.S.C. § 3730(e)(4)(B). In addition, Elkay has voluntarily provided this information to the Government before filing this action as required by 31 U.S.C. § 3730(e)(4)(B).

**Drawn Sinks Produced In China Were Transshipped Through Mexico Without Being Substantially Transformed Into Non-Subject Merchandise**

35.     In order to avoid antidumping and countervailing duty cash deposits on drawn sinks produced in China, Defendants knowingly entered or conspired to enter Chinese-manufactured drawn sinks that were subject to the AD/CVD Orders, but declared or conspired to declare on Customs entry documents that the country of origin of the Chinese-manufactured sinks was Mexico.  Declaring the drawn sinks to be from Mexico enabled Defendants to avoid the imposition of cash deposits required by the AD/CVD Orders and regular Customs duties assessed on drawn sinks from China.

36.     In the litigation entitled *Vincent Edward Roach, Sr. v. Compass Manufacturing International, LLC, et al*, Civ. Action No. 4:13-CV-1421 (S.D. Tex) ("*Roach v CMI*"), Todd Hublar, an employee of CMI, testified under oath that Defendants CMI and  Mr. DeLeon, owner of Defendant DeLeon Companies/Porcelamex, have been transshipping Chinese-manufactured drawn sinks that are subject to the AD/CVD Orders from China through Mexico into the United States:

> Q. Other than putting together a business plan for building a sink factory in early 2012 in Mexico, and the reason y'all were doing that was because the tariffs for importing stainless steel sinks from your Chinese investor were going to be cost prohibitive because of the antidumping lawsuit that would been filed against – or with the Trade Commission; right?
>
> A. That's correct.
>
> Q. So the idea was Chinese sinks, instead of coming directly to the United States, can we somehow send them to Mr. DeLeon, let him repackage them and then import them into the United States and avoid the tariff that was being hammered on the investor?
>
> A. Yes. Our agreement with DeLeon was that they would make them NAFTA approved, there was a certain percentage that they would have to do to the sinks in order to make them legal to come to the United States without the tariff.

Q. Did any of those things ever happen?

A. Yes.

Q. So Chinese sinks started going to Mr. DeLeon in Mexico in 2012, and then to the United States?

A. I believe 2012.

**Exhibit 4.**

37.     Commerce has country-of-origin rules to determine whether foreign manufactured products are within the scope of an antidumping or countervailing duty order. Commerce first looks to the scope of the antidumping or countervailing duty order to determine whether the product is within the scope of the order. In this case, both finished and unfinished drawn sinks are in the scope of the AD/CVD Orders. *Drawn Stainless Steel Sinks From the People's Republic of China*, 78 Fed. Reg. 21,592 (April 11, 2013); *Drawn Stainless Steel Sinks From the People's Republic of China*, 78 Fed. Reg. 21,596 (April 11, 2013).

38.     In some instances, products may undergo additional processing in a third country, which may result in the product being excluded from the scope of an antidumping or countervailing duty order. To identify the country of origin of a product that undergoes additional third-country processing, Commerce conducts its "substantial transformation" analysis to determine whether the third-country processing is minor or insignificant. 19 U.S.C. § 1677j(b). Commerce's substantial transformation rule provides a yardstick for determining whether the processes performed on merchandise in a country "are of such a substantial nature to justify the conclusion that the resulting product is a manufacture of that country." *Ferrostaal Metals Corp. v. United States*, 11 C.I.T. 470, 473, 664 F. Supp. 535, 537 (1987). Substantial transformation generally refers to a degree of processing or manufacturing that results in a new and different article. To determine if merchandise exported from an intermediate country is

covered by an antidumping order, Commerce identifies the country of origin by considering

whether the essential component is substantially transformed in the country of exportation.

*Smith Corona Corp. v. United States*, 17 C.I.T. 47, 50, 811 F. Supp. 692, 695 (1993).  In short,

Commerce examines whether the degree of processing or manufacturing resulted in a new and

different article.  *E.I. DuPont de Nemours & Co. v. United States*, 22 C.I.T. 370, 372; 8 F. Supp.

2d 854, 857 (1998).

  39.  CBP also has country-of-origin rules, which determine the country of origin of

imported merchandise for, among other things, general Customs duties.  19 C.F.R. §§ 102.11 *et*

*seq.*, 181.131.  These are similar to Commerce's country-of-origin rules used to determine

whether merchandise is within the scope of an antidumping or countervailing duty order.

  40.  No further manufacturing processes took place in Mexico that would remove the

transshipped drawn sinks from the scope of the AD/CVD Orders.  During its investigation, Elkay

acquired three of CMI's Bala brand drawn sinks after they had been imported into the United

States.  Two were labeled "Made In Mexico," and one was labeled "Made In China."  Elkay

analyzed these three sinks at its lab and concluded that, despite the different country of origin

labels, all three drawn sinks were produced at the same facility and were substantially the same

after they had been imported the United States.  In addition, Elkay's analysis indicates that one

of the sinks labeled "Made In Mexico" was identical to the sink labeled "Made In China" after

they had entered the United States.

  41.  In particular, Elkay scanned the three drawn sinks with a material analyzer to

determine the recipe for the stainless steel and concluded that the chemistry on all three sinks

was similar and that all three sinks had the same melt code target.  The chemistry of the stainless

steel used in the three sinks also did not meet the American Society of Mechanical Engineers

("ASME") requirements for approved stainless steel grades. The closest match was in the general area of a 200 series austenitic stainless steel, and the most plausible grade target was a 204 series stainless steel. This unique chemistry for the stainless steel in the three sinks demonstrates that all three sinks were made from steel produced at the same steel mill and had not been altered after production.

42.     The physical characteristics of the three drawn sinks also indicate that they were produced at the same facility and were substantially the same when they entered the United States. The finish on drawn sinks may be applied using one of two methods – prior to forming (or drawing) the sink or after forming. All three drawn sinks were finished after forming, and the fineness of the scratch pattern and transition of the bottom bowl finish and side bowl finish on all three sinks were similar, indicating that they likely were produced and finished using the same process and equipment and were substantially the same when they entered the United States.

43.     All three sinks also had an almost identical "orange peel" pattern. The "orange peel" pattern acts like a fingerprint of the equipment used to draw the sink. Multiple variables contribute to a sink's orange peel pattern, including steel chemistry, tooling of the machine, the processing history of the machinery, and forming parameters of the press. The similarities of the orange peel pattern on the sink labeled "Made In China" and one of the sinks labeled "Made In Mexico" indicate that the sinks were made at the same production facility and likely on the same machine. Finally, the sound deadening pads on each sink appear identical, and the sound deadener spray pattern on each sink appears to be very similar. These features indicate that none of the three sinks had been further processed in Mexico after being produced in China.

44.    Elkay's independent analysis of these three drawn sinks constitutes knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions under 31 U.S.C. § 3730(e)(4)(B).  In addition, Elkay has voluntarily provided this information to the Government before filing this action as required by 31 U.S.C. § 3730(e)(4)(B).

### CBP's Antidumping And Countervailing Duty And Country-Of-Origin Reporting Requirements

45.    An importer of record "shall, using reasonable care… complete the entry by filing with the Customs Service the declared value, classification and rate of duty applicable to the merchandise" and provide any other information to enable CBP to "properly assess duties on the merchandise." 19 U.S.C. §1484(a)(1)(B)(i).  U.S. importers also are required to submit entry documentation to CBP to secure the release of their merchandise, including specific CBP Forms and a commercial invoice.  19 C.F.R. §§ 142.3(a)(3) and 141.81.  The "importer of record," or authorized agent, must file entry documents with CBP for goods imported into the United States upon arrival of the shipment.  19 U.S.C. § 1484.  These entry documents include CBP Form 7501 (used to calculate the duties owed), CBP Form 3461 (used for Customs release and followed by a CBP Form 7501 within ten days), a commercial invoice, a packing list, and a bill of lading. 19 C.F.R. § 142.3(a) and (b).

46.    The U.S. importer must declare, *inter alia*, the country of origin of the imported merchandise and whether the merchandise is subject to antidumping or countervailing duty cash deposits on CBP Form 7501.  The U.S. importer also must declare the country of origin of the merchandise on CBP Form 3461. CBP Forms 7501 and 3461 are attached as **Exhibits 10 and 11.**  Commercial invoices must identify the country of origin of the merchandise.  19 C.F.R. 141.86(a)(10) and 19 U.S.C. § 1481(a)(1).  Individuals acting on behalf of the importer of record and with knowledge of the sales transaction either complete the information in CBP Forms 7501

- 17 -

and 3461 or direct an authorized agent to complete the forms for them. The information supplied in CBP Forms 7501 and 3461 is based on information included in the commercial invoice and packing list, which is typically the official sales documentation between the exporter and the Importer of Record (or the ultimate customer when the importer of record is an agent).

47.    Importers must declare whether an entry is subject to an antidumping or countervailing duty order and the country of origin in specific places on these two forms. The first place is the field requiring the importer to report "Entry Type" -- Field 3 in Form 3461 and Field 2 in Form 7501. A typical entry of merchandise for consumption is a "Type 1" entry; an entry of merchandise subject to an antidumping or countervailing duty order is a "Type 3" entry. The next place is the field requiring the importer to report the "Country of Origin" -- Field 25 in Form 3461 and Field 10 in Form 7501.

48.    In addition, CBP regulations provide that "[t]he entry summary filed for merchandise subject to an antidumping or countervailing duty order must include the unique identifying number assigned by the Department of Commerce, International Trade Administration." 19 C.F.R. § 141.61(c). Consistent with this regulation, Field 29.B of CBP Form 7501 requires the importer of record to report the "AD/CVD No."

49.    Each exporter of drawn sinks that participated in the original antidumping investigation received a company-specific AD number, which is issued by Commerce in its cash deposit instructions to CBP. The company-specific AD number for merchandise produced by Superte and exported by Zhaoshun or Superte is A-570-983-001. Similarly, exporters who participated in the countervailing duty investigation received a company-specific CVD number, which is also issued by Commerce. The company-specific CVD number for merchandise

produced by Superte and exported by Superte is C-570-984-002, and the company-specific CVD

number for merchandise produced by Superte and exported by Zhaoshun is C-570-984-003.

50.     If the U.S. importer seeks tariff preferences under the North American Free Trade

Agreement ("NAFTA"), which is a duty rate of zero for drawn sinks, it must declare that the

entered merchandise qualifies as an originating good of a NAFTA country.  NAFTA Chapter 5,

Section A, Article 501 *et seq.,* 32 I.L.M. 289 (1993); NAFTA Implementation Act, 103 P.L. 182;

107 Stat. 2057 (1993); 19 C.F.R. 181.11(a).  Every importer of goods who seeks preferential

tariff treatment under the NAFTA must "make a formal declaration that the good qualifies for

such treatment . . . , by including on the entry summary . . .the symbol . . . "MX" for a good of

Mexico as a prefix to the subheading of the HTSUS under which each qualifying good is

classified." 19 C.F.R. § 181.21(a).  "[T]he declaration must be based on a complete and properly

executed original Certificate of Origin, which is in the possession of the importer and which

covers the good being imported" and shall be submitted to CBP upon request.  19 C.F.R. §

181.21(a), 181.22(b).  The NAFTA Certificate of Origin used for imports into the United States

is CBP Form 434.  Although CBP Form 434 only includes a limited number of fields, the

certifier must declare that "[t]he goods originated in the territory of one or more of the parties,

and comply with the origin requirements specified for those goods in the [NAFTA] . . . ." and

must "agree to maintain and present upon request, documentation necessary to support this

certificate." CBP Form 434 is attached as **Exhibit 12.**

51.     Every importer of record also must declare that the statements made on invoices

and other entry documents are true and correct.  19 U.S.C. §1485(a)(3); 19 U.S.C. §1484(d)(1);

and 19 C.F.R. § 141.61(a)(2).  The Declaration of Importer of Record (Owner or Purchaser) or

Authorized Agent is provided in Field 36 in Form 7501.  The certification of accuracy is

provided in Field 27 in Form 3461. CBP Form 434 also includes a certification of accuracy and

the assumption of "the responsibility for proving such representations" included in the NAFTA

Certificate of Origin. Typically, an employee or official working for the importer of record signs

these certifications. The individual that signs the certifications and declarations must have

knowledge of the information used to fill out the CBP forms.

52.     U.S. importers are required to pay the required amount of cash deposits, duties,

and fees estimated to be payable on such merchandise "at the time of entry." 19 U.S.C. §

1505(a). Importers of record (or other party) also are required to keep records and

documentation related to each entry. 19 U.S.C. § 1508(a).

### Defendants Knowingly Made, Caused to Be Made, Or Conspired To Make False Statements On Entry Documents Submitted To CBP And Deprived The Government Of Lawfully Owed Antidumping And Countervailing Duty Cash Deposits And General Customs Duties

53.     CMI imported drawn sinks from China that were produced by Superte and

exported by Zhaoshun prior to Commerce's August 6, 2012 preliminary countervailing duty

determination and October 4, 2012 preliminary antidumping duty determination on drawn sinks

from China. Defendants Wolfe and Li were instrumental to these importations. Defendant

Wolfe was the president of CMI and directed its operations. In addition, "without [Defendant

Li], CMI's ability to bring product in from China was an impossibility." **Exhibit 4.**

54.     As described in paragraphs 22-34 above, Defendants CMI and DeLeon

Companies/Porcelamex imported Chinese-manufactured drawn sinks subject to the AD/CVD

Orders after Commerce's preliminary determinations requiring cash deposits but labeled these

sinks as "Made In Mexico." As shown in paragraph 36 above, Defendant Mr. DeLeon agreed to

conduct additional operations on the Chinese-manufactured drawn sinks purportedly to make

them eligible for duty-free treatment upon entry into the United States. Defendants Wolfe and Li

were instrumental to these importations. Defendant Wolfe continued to act as president of CMI and direct its operations, including its importing operations. In addition, Defendant Wolfe had been engaged in a series of negotiations with Mr. DeLeon to sell CMI to him, including the drawn sink business, although the sale was never concluded. **Exhibit 4.** According to Mr. Wolfe, CMI's ability to source drawn sinks from China is what made CMI a unique opportunity for Mr. DeLeon, which demonstrates the importance of maintaining the Chinese source of supply of drawn sinks notwithstanding the AD/CVD Orders. **Exhibit 4.** Defendant Li also was instrumental to these importations. He was the product manager for CMI and arranged with CMI personnel the shipment of boxes from the United States to Mexico to package drawn sinks for import into the United States. **Exhibit 13.** Finally, as shown in paragraphs 40-44 above, no further manufacturing occurred in Mexico with respect to the Chinese-manufactured drawn sinks notwithstanding Mr. DeLeon's agreement.

55.    CBP Forms 7501, 3641, and 434, commercial invoices, bills of lading, packing slips, and other forms and documents filed by importers with CBP and used to enter goods into the United States are confidential to the importer and CBP and are not available to the Plaintiff or the public. 18 U.S.C. § 1905; 19 C.F.R. §§ 103.12(d); 103.35(a); 181.11; 181.21. As a result, Plaintiff cannot present the CBP Forms and accompanying documents on which Defendants or their agents declared that their drawn sinks imported from Mexico were not subject to the AD/CVD Orders.

56.    Nevertheless, Defendants CMI and DeLeon Companies/Porcelamex would have had to declare the country of origin of their drawn sinks and whether their drawn sinks were subject to the AD/CVD Orders on the Customs forms used to import their drawn sinks into the United States after Commerce's preliminary determinations requiring cash deposits on imports.

19 U.S.C. §§ 1481(a)(1), 1484; 19 C.F.R. §§ 141.61, 141.81, 141.86(a)(10), and 142.3. It is reasonable to expect that Defendants CMI and DeLeon Companies/Porcelamex completed the required Customs forms consistent with the Defendants' scheme to claim that additional operations on the Chinese-manufactured drawn sinks had occurred in Mexico, which operations purportedly made the sinks eligible for duty-free treatment upon entry into the United States. It is also reasonable to expect that Defendants CMI and DeLeon Companies/Porcelamex represented on the required Customs forms the country of origin and applicability of the AD/CVD Orders to the drawn sinks consistent with the country-of-origin markings on the drawn sinks declaring that they were "Made In Mexico."

57.     Import statistics also evidence Defendants' scheme of transshipping Chinese-manufactured drawn sinks subject to the AD/CVD Orders through Mexico to evade the payment of antidumping and countervailing duty cash deposits and regular Customs duties. CBP requires that all merchandise entering the United States be classified under the Harmonized Tariff Schedule of the United States ("HTS"). The HTS is a U.S. nomenclature system used to classify imported goods based on their material composition, product name, and/or intended function. The HTS is designed so that each article falls into only one category. It is divided into chapters, headings, and subheadings. CBP uses this system and its rules to classify imported goods. The HTS is used to determine the rate of duty applied to an imported good and used to collect statistics on imported goods.

58.     Prior to July 2012, drawn sinks were classified in the HTS under subheading 7324.10.00. On July 1, 2012, this subheading was divided into two ten-digit HTS numbers -- HTS number 7324.10.0010 for drawn sinks (subject to the orders) and HTS number 7324.10.0050 for fabricated sinks (not subject to the orders).

59.     U.S. import statistics show that declared imports of drawn sinks from China that are subject to the AD/CVD Orders have declined since Commerce's preliminary determinations in 2012.  During July - December 2012, 926,865 drawn sinks entered the United States from China.  **Exhibit 14.**  Over the same period in 2013, 900,905 drawn sinks entered the United States from China, a decrease of 2.8 percent.  Entries of drawn sinks from China continued to decline in 2014.  Entries of drawn sinks from China during January – November 2014 were 3.63 percent lower than the volume of entries over the same period in 2013.  **Exhibit 14.**  By contrast, declared imports of drawn sinks from Mexico have dramatically increased since the cash deposit requirement went into effect on drawn sinks from China.  During July - December 2012, 184,376 drawn sinks entered the United States from Mexico.  **Exhibit 14.**  Over the same period in 2013, 364,947 drawn sinks entered the United States from Mexico, an increase of 97.9 percent. **Exhibit 14.**  Imports of drawn sinks purportedly from Mexico during 2014 remained higher than pre-order, 2012 levels.  The average monthly volume of drawn sinks from Mexico in 2012 was 30,729 units per month.  **Exhibit 14.**  The average monthly volume of drawn sinks from Mexico in 2014 is 49,148 units per month.  **Exhibit 14.**

60.     Defendants' false statements were made knowingly within the meaning of 31 U.S.C. § 3729(b).  In particular, Defendants made, caused to be made, or conspired to make declarations to Customs with actual knowledge that the drawn sinks imported from Mexico were manufactured in China and were subject to the AD/CVD Orders, or acted in deliberate ignorance or reckless disregard of the truth or falsity of this information.  As shown in paragraph 36 above, Defendant Mr. DeLeon agreed to conduct additional operations on the Chinese-manufactured drawn sinks to make them eligible for duty-free treatment upon entry into the United States.  But Defendants knew or acted in deliberate ignorance or reckless disregard of that fact that the

AD/CVD Orders covered both finished and unfinished drawn sinks.  In addition, Defendants were able to compare sinks labeled "Made in Mexico" to sinks labeled "Made in China" and determine, as did Elkay, that no further operations had been conducted in Mexico that would remove them from the scope of the AD/CVD Orders, but acted in deliberate ignorance or reckless disregard of the similarities between the sinks.  Defendants' false statements have deprived the United States of antidumping and countervailing cash deposits legally owed as a result of the AD/CVD Orders on drawn sinks from China, as well as general Customs duties.

## COUNT I:

### FALSE STATEMENT AND CONCEALMENT OF OBLIGATION TO PAY ANTIDUMPING AND COUNTERVAILING DUTY CASH DEPOSITS

61.     The allegations of paragraphs 1 through 60 are restated and incorporated by reference.

62.     The False Claims Act imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 37 U.S.C. § 3129(a)(1)(G).   The False Claims Act also imposes liability on any person who "conspires to commit a violation of subparagraph . . . (G)."

63.     By importing or conspiring to import drawn sinks manufactured in China, failing to declare that they are subject to the AD/CVD Orders, and declaring them to be made in Mexico, Defendants knowingly made, caused to be made, or conspired to make a false statement material to their obligation to pay antidumping and countervailing duty cash deposits and knowingly concealed or avoided their obligation to pay 51.87 or 51.98 percent antidumping and countervailing duty cash deposits (depending on the exporter) and caused the United States to

- 24 -

suffer actual damages.

## COUNT II:

### FALSE STATEMENT AND CONCEALMENT OF OBLIGATION TO PAY GENERAL CUSTOMS DUTIES

64.     The allegations of paragraphs 1 through 60 are restated and incorporated by reference.

65.     The False Claims Act imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 37 U.S.C. § 3129(a)(1)(G).  The False Claims Act also imposes liability on any person who "conspires to commit a violation of subparagraph . . . (G)."

66.     By importing or conspiring to import drawn sinks manufactured in China, declaring them to be made in Mexico in order to qualify them as originating goods for purposes of preferential tariff treatment under the NAFTA, and filing a claim for preferential treatment, Defendants knowingly made, caused to be made, or conspired to make a false statement material to their obligation to pay general Customs duties and knowingly concealed or avoided their obligation to pay general Customs duties of 3.4 percent on drawn sinks originating in China and caused the United States to suffer actual damages.

## COUNT III:

### FALSE STATEMENT AND CONCEALMENT OF OBLIGATION TO PAY MARKING DUTIES

67.     The allegations of paragraphs 1 through 60 are restated and incorporated by reference.

68.     The False Claims Act imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 37 U.S.C. § 3129(a)(1)(G).   The False Claims Act also imposes liability on any person who "conspires to commit a violation of subparagraph . . . (G)."

69.     The Tariff Act of 1930 requires importers to pay marking duties of 10 percent of the value of any merchandise imported with erroneous country of origin markings.  19 U.S.C. § 1304(h).

70.     By importing or conspiring to import drawn sinks manufactured in China and declaring them to be made in Mexico, Defendants knowingly made, caused to be made, or conspired to make a false statement material to their obligation to pay the 10 percent marking duties and knowingly concealed or avoided their obligation to pay the 10 percent marking duties as required by 19 U.S.C. § 1304(h) and caused the United States to suffer actual damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, Elkay Manufacturing Company, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States as follows:

1.  For treble the amount of the United States' damages, plus the maximum amount of civil penalties available by law for each false claim;

2.  For all costs of this civil action; and

3.  For prejudgment interest and for such other and further relief as the Court deem just and equitable.

Moreover, Plaintiff, Elkay Manufacturing Company, on its own behalf, demands and prays that an award be made in its favor as follows:  for 25 percent of the proceeds collected by the United States if it intervenes in and conducts this action, or for 30 percent of the proceeds if the United States does not intervene; for an amount for reasonable expenses necessarily incurred by the relator in prosecution of this action; for all reasonable attorneys' fees, expenses, and costs incurred by the relator; and such other and further relief to which the relator may show himself justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff, Elkay Manufacturing Company, demands that this case be tried before a jury.

Respectfully submitted,

Jeffrey M. Telep
P. Lee Smith
KING & SPALDING, LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 737-0500

*Counsel For Plaintiff Elkay Manufacturing Company*

## CERTIFICATE OF SERVICE

I hereby certify that the **COMPLAINT: FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** has been served via certified mail, return receipt requested, sufficient postage prepaid, addressed as follows:

William Campbell
Assistant United States Attorney
United States Department of Justice
Western District of Kentucky
717 West Broadway
Louisville, KY 40202

Attorney General of the United States
c/o Joyce R. Branda
Acting Assistant Attorney General, Civil Division
Fraud Section
Commercial Litigation Branch
U.S. Department of Justice
Ben Franklin Station
Washington, DC 20044

This the 17th day of February, 2015.

Jeffrey M. Telep
P. Lee Smith
KING & SPALDING, LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 737-0500

*Counsel For Elkay Manufacturing Company*